UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 10 CR 195 |
| v. | ) | |
| | ) | Judge Amy J. St. Eve |
| BRIAN HOLLNAGEL, *et al.* | ) | |

**GOVERNMENT'S MOTION TO DISQUALIFY PAULA JUNGHANS
AS COUNSEL AT THE TRIAL OF THIS MATTER AND ANY OTHER EVIDENTIARY
HEARINGS AT WHICH SHE MAY BE A WITNESS**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United

States Attorney for the Northern District of Illinois, pursuant to Local Rule 83.53.7 of this Court,

moves this Court to disqualify Paula Junghans as counsel at the trial of this matter and any other

evidentiary hearings at which she may be a witness. Further, the government respectfully suggests

that this Court consider whether Ms. Junghans and her law firm, Zuckerman Spaeder, LLP

("Zuckerman"), are barred by the Sixth Amendment from representing defendants Brian Hollnagel

("Hollnagel") and BCI Aircraft Leasing, Inc. ("BCI") due to a potential conflict of interest. In

support of this motion, the government states as follows:

I.      **Introduction**

Presently, Ms. Junghans and Scott R. Lassar are co-lead counsel for defendants Hollnagel

and BCI (collectively, the "defendants"). The government seeks to disqualify Ms. Junghans as

counsel at the trial of this matter because she is a potential defense and government witness.

Similarly, the government seeks to disqualify Ms. Junghans as counsel at any evidentiary hearings

during which she may be a witness. As is demonstrated in the "Government's Motion for

Disclosure of Attorney-Client Communications Regarding the Preparation of Court-Ordered

Accountings or, in the Alternative, to Conduct an *In Camera* Hearing" (the "Crime-Fraud Motion"),

Ms. Junghans is a potential witness regarding the production and dissemination to the United States Securities and Exchange Commission (the "SEC") of the allegedly false court-ordered accountings.[1] The production of those false court-ordered accountings is the subject of the obstruction of justice charge in Count Fifteen of the superseding indictment and is alleged to be an act in furtherance of the fraudulent financing scheme alleged in Count Two. Further, as defendants concede in their severance motion, Ms. Junghans is a potential witness regarding the preparation and filing of defendant Hollnagel's 2006 federal individual income tax return. R. 169 at 7, n.3.[2] Defendant Hollnagel's 2006 tax return is the subject of Count Twenty-One of the superseding indictment.

Local Rule 83.53.7 prohibits a lawyer from acting as an advocate in a trial or evidentiary hearing if the lawyer knows or reasonably should know that she may be called as a witness on the client's behalf or by another party if the testimony is or may be prejudicial to the client. Here, it is equally likely that Ms. Junghans will be called as a witness by defendants and the government regarding her knowledge of the above-described topics. To the extent Ms. Junghans is a government witness, her testimony may be prejudicial to defendants. Accordingly, this Court should grant this motion.

Additionally, the same facts that require disqualification of Ms. Junghans as trial counsel may also preclude Ms. Junghans and Zuckerman from any further representation of defendants because of a conflict of interest. The government does not presently believe that it has sufficient facts to move for full disqualification. However, the government believes that, based on the facts,

---

[1]The government is not contending that Ms. Junghans has engaged in criminal conduct. As is described in the Crime-Fraud Motion, the applicability of the crime-fraud exception is not dependent on a defendant's attorney participating in the fraud.

[2]Citations to the docket in this case are designated as "R." followed by the docket number.

this Court may want conduct further inquiry in order to resolve the issue sufficiently in advance of trial. The government does not object to this Court conducting the hearing *in camera* and *ex parte*.

## II. Factual Background

### A. Counts Two and Fifteen

Count Two of the superseding indictment[3] charges defendants Hollnagel and BCI, among others with engaging in a fraudulent financing scheme that deprived investors, financial institutions and others of money and property. R. 46 at Count Two. Further, the superseding indictment charges defendants Hollnagel, BCI and Martin Collier with obstructing and attempting to obstruct the SEC's lawsuit against defendants Hollnagel and BCI in the matter of *United States Securities and Exchange Comm'n v. Hollnagel, et al.*, 07 CV 4538 (N.D. Ill.) (Bucklo, J.) (the "SEC Proceeding"). *Id.* at Count Fifteen.

Both the fraud and obstruction counts contain allegations relating to the preparation and dissemination to the SEC of allegedly fraudulent accountings of the following two BCI investment entities – BCI Prime Investment 2004-5, LLC ("Prime 2004-5") and BCI Prime Investment 2004-6, LLC ("Prime 2004-6"). *Id.* at Count Two, ¶¶ 30-32; Count Fifteen. Specifically, the superseding indictment alleges that: (a) on or about September 6, 2007, defendants Hollnagel, BCI and Collier caused to be prepared and provided to the SEC fraudulent accountings of Prime 2004-5 and Prime 2004-6 (the "Initial Accountings"); and (b) on or about September 17, 2007, defendants Hollnagel, BCI and Collier caused to be prepared and provided to the SEC an amended accounting of Prime 2004-5 (the "Amended Accounting"). *Id.*

---

[3]Paragraphs 1 through 34 of Count Two are incorporated into Counts Three through Eleven. The government collectively refers to Counts Two through Eleven as the "fraud counts."

The superseding indictment alleges that the Initial Accountings were fraudulent because, among other things, they: (a) falsely represented that Prime 2004-5 and Prime 2004-6 had each obtained an ownership interest in a particular aircraft at a marked-up price; and (b) falsely represented the total amount of investors' funds invested in Prime 2004-5 and Prime 2004-6. *Id.* at Count Two, ¶ 31; Count Fifteen. The superseding indictment alleges that the Amended Accounting was fraudulent because, among other things, it: (a) falsely represented that Prime 2004-5 had obtained an ownership interest in a particular aircraft at a marked-up price; (b) falsely represented the total amount of investors' funds invested in Prime 2004-5; and (c) falsely represented that a new aircraft had been substituted into Prime 2004-5. *Id.* at Count Two, ¶ 32; Count Fifteen.

In the Crime-Fraud Motion, the government set forth the evidence available to the government of Ms. Junghans' involvement in the preparation and review of the allegedly false accountings. The government incorporates the facts set forth in the Crime-Fraud Motion here.

As a result of Ms. Junghans' involvement in the preparation and review of the allegedly false accountings, Ms. Junghans may be a government witness or a witness for defendants Hollnagel and BCI. The government anticipates that any testimony it would elicit from Ms. Junghans would be prejudicial to defendants Hollnagel and BCI. The government assumes that Ms. Junghans would testify that defendants did not inform her that the draft and final versions of the accountings that they provided to her for her review were false. In that way, defendants used Ms. Junghans to further conceal their fraudulent scheme – *i.e.*, defendants misled Ms. Junghans about the veracity of the accountings, resulting in those accountings being provided to the SEC.

**B.     Count Twenty-One**

Count Twenty-One charges defendant Hollnagel with filing a false federal individual income tax return for 2006. Specifically, Count Twenty-One alleges that, on or about October 15, 2007,

4

defendant Hollnagel filed his 2006 federal individual income tax return, representing that his adjusted gross income was $75,488. R. 46 at Count Twenty-One. According to the superseding indictment, defendant Hollnagel omitted approximately $3 million[4] in income that he indirectly received from defendant BCI, which money defendant Hollnagel used to purchase a home in Aspen, Colorado (the "Aspen Home"). *Id.*

The issue surrounding the above-described $3 million is whether it was income to defendant Hollnagel or a loan. Prior to the grand jury returning the superseding indictment, Ms. Junghans and Mr. Lassar informed the government that defendant Hollnagel took the position that the $3 million was a loan and, therefore, did not need to be reported on defendant Hollnagel's tax return. Ms. Junghans and Mr. Lassar informed the government that, if charged with tax fraud, defendant Hollnagel might assert an advice of counsel defense based on advice provided by Ms. Junghans. Ms. Junghans and Mr. Lassar further informed the government that defendant Hollnagel agreed to waive the attorney-client privilege with respect to Ms. Junghans' advice as it related to the 2006 tax return.

The government interviewed Ms. Junghans on July 8, 2010. During the interview, Ms. Junghans stated that defendant Collier prepared defendant Hollnagel's 2006 tax return, and she reviewed it prior to its filing. According to Ms. Junghans, her primary focus in reviewing the return was on the treatment of the $3 million that had been transferred to defendant Hollnagel in 2006. According to Ms. Junghans, because the $3 million was a *loan from defendant BCI* to defendant Hollnagel, the money was not income. In reviewing the return, Ms. Junghans made sure that the $3 million was not reported as income.

---

[4]For the remainder of this brief, the approximately $3 million is referred to as "$3 million."

During the interview, Ms. Junghans explained that in determining that the $3 million was a loan, she looked to the fact that defendant BCI historically had treated money provided to defendant Hollnagel in excess of his salary as a loan. Ms. Junghans stated that she did not discuss with defendant Hollnagel why the purported $3 million loan from defendant BCI to defendant Hollnagel was first transferred to the bank account of BCI Jets Sales and Leasing, LLC ("BCI Jets"). BCI Jets was an entity that bought and sold corporate aircraft and converted commercial aircraft into corporate aircraft. In 2006, defendant Hollnagel was BCI Jets' sole member.

Ms. Junghans initially stated that according to notes from her initial interview with defendant Hollnagel, he told her that defendant BCI had loaned him $4.5 million, the loans were memorialized through interest-bearing notes, and he made annual payments on the notes with interest. Ms. Junghans later stated that she was not sure whether defendant Hollnagel told her that promissory notes existed. They did not.

Contrary to Ms. Junghans' statements, defendant BCI's accounting records did not record the $3 million in transfers as a loan from defendant BCI to defendant Hollnagel. Rather, defendant BCI's accounting records showed that between January 13, 2006 and January 18, 2006, defendant BCI transferred approximately $3.3 million to BCI Jets' bank account through four separate transfers of $300,000; $350,000; $150,000; and $2.5 million. While the government obtained various versions of defendant BCI's accounting records, as they existed at different points in time between April 2007 and August 2008, none of those versions recorded the $3.3 million in transfers as loans from defendant BCI to defendant Hollnagel. The earliest version of the accounting records: (a) had no description for the $300,000 and $350,000 transfers; (b) described the $150,000 transfer as a "Due from BCI Jets"; and (c) described the $2.5 million transfer as a "Marketing Deposit/Retainer-Marketing." The latest version of the accounting records: (a) described the

6

$300,00 transfer as a "Due to BCI Jets"; and (b) the remainder of the transfers as marketing advances.

BCI Jets' accounting records from April 2007 had no description for the transfers from BCI Jets to an escrow account related to the purchase of the Aspen Home. By late May 2007, BCI Jets' accounting records recorded the transfers from BCI Jets to the escrow account as a "Note Receivable – Shareholder."

According to Ms. Junghans, defendant Hollnagel repaid a substantial portion of the $3 million loan from defendant BCI by the time the SEC filed its lawsuit in August 2007. Ms. Junghans did not know if defendant Hollnagel continued to make payments on the $3 million loan but stated that he still recognized it as an obligation.

During Ms. Junghans' interview, the government questioned her about a "Marketing Services Agreement" (the "MSA") entered into between defendant BCI and BCI Jets and a "Joint Venture and Loan Agreement" (the "JVLA") (the MSA and JVLA are collectively referred to as, the "Agreements") entered into between BCI Jets and defendant Hollnagel. Copies of the MSA and JVLA are attached hereto as Government Exhibits 1 and 2, respectively. Prior to the interview, the government's investigation revealed that CW-1, defendant BCI's former Senior Vice President – Finance, had drafted the Agreements at defendant Hollnagel's direction. One of the purposes of the Agreements was to describe the above-described transfers in a way that did not result in any income to defendant Hollnagel.[5] The Agreements were created after the transfers had taken place and executed in late summer or early fall 2006. The Agreements were backdated to make them appear

---

[5]Another purpose of the Agreements was to make BCI Jets appear to be a standalone company so that its financial activities did not need to appear in defendant BCI's financial statements.

as if they had been entered into on January 31, 2006. Defendant Hollnagel signed the MSA on defendant BCI's behalf and the JVLA on his own behalf. According to CW-1, prior to the Agreements being drafted, defendant Hollnagel discussed with CW-1 different ways to account for the transfers.

According to the MSA, defendant BCI agreed to pay BCI Jets a marketing fee in connection with the conversion of a commercial aircraft to a corporate aircraft. Pursuant to the MSA, upon the execution of the MSA, defendant BCI was to pay BCI Jets a $3 million deposit toward the marketing fee that BCI Jets was to earn in the future.

According to the JVLA, defendant Hollnagel purchased the Aspen Home in "April 2006" with a first position loan from Merrill Lynch and a second position loan from BCI Jets, not BCI. The JVLA did not reconcile how it was entered into on January 31, 2006, but was able to reference a home that had been purchased in April 2006. According to the JVLA, defendant Hollnagel agreed to lease the Aspen Home to BCI Jets for a specified amount of days per year.

During Ms. Junghans' interview, she acknowledged that the Agreements had been backdated. Ms. Junghans also claimed that the Agreements did not correctly characterize what had occurred with respect to defendant Hollnagel's use of the $3 million to purchase the Aspen Home. Ms. Junghans explained that defendant Hollnagel had lost confidence in CW-1 and anything CW-1 had done was ignored. As a result, according to Ms. Junghans, she and defendants Hollnagel and Collier collectively came to the conclusion to disregard the Agreements in determining how to treat the $3 million for tax purposes.

During the interview, the government showed Ms. Junghans a "Settlement Agreement" and "Amendment to Settlement Agreement" entered into between defendant BCI and BCI Jets. Defendant Hollnagel signed both agreements on behalf of both companies. Copies of the Settlement

8

Agreement and Amendment to Settlement Agreement are attached hereto as Government Exhibits 3 and 4, respectively.

While the Settlement Agreement represented that it was dated "as of October __, 2007," the Amendment to Settlement Agreement represented that the Settlement Agreement was dated as of October 1, 2007 – twelve days before defendant Hollnagel signed his 2006 federal individual income tax return. Significantly, contrary to the information provided by Ms. Junghans, the Settlement Agreement *recognized the existence and validity of the MSA* and amended its terms to allow defendant BCI to take certain actions in the SEC Proceeding. Moreover, while the Settlement Agreement recognized that defendant Hollnagel had paid approximately $4 million to defendant BCI in the spring and summer of 2007, it only characterized a portion of those payments as loan repayments. According to the Settlement Agreement, $2,127,065.18 constituted a return by defendant Hollnagel of a portion of the deposit that defendant BCI had made to BCI Jets pursuant to the MSA, not a loan repayment. In short, the Settlement Agreement directly contradicted what Ms. Junghans had told the government regarding the MSA, which information Ms. Junghans represented had been agreed to by her and defendants Hollnagel and Collier.[6]

During her interview, Ms. Junghans initially stated that she did not remember if she had seen the Settlement Agreement before reviewing and approving defendant Hollnagel's 2006 tax return. However, she later stated that she had not seen the agreement prior to the tax return being filed. Ms. Junghans stated that she had not previously seen the Amendment to Settlement Agreement.

---

[6]The Amended Settlement Agreement also confirmed the existence of the MSA. The Amended Settlement Agreement amended the terms of the Settlement Agreement to allow defendant BCI to funnel $500,000 to a limited liability company whose sole member was defendant Hollnagel's wife.

After seeing the Settlement Agreement and Amendment to Settlement Agreement, Ms. Junghans reaffirmed that when defendant Hollnagel's 2006 tax return was filed, she believed that the MSA and JVLA had been disregarded and no longer were in effect. Ms. Junghans stated that neither defendant Hollnagel nor defendant Collier disabused her of that notion.

In an October 28, 2008, memo from defendant Collier to defendant Hollnagel and "files," defendant Collier, again, reaffirmed the validity of the MSA, although not by name. Further, in the memo, defendant Collier reaffirmed the validity of the JVLA, although not by name. A copy of defendant Collier's memo is attached hereto as Government Exhibit 5. The government did not show the October 28, 2008, memo to Ms. Junghans during her interview.

## III.     Argument

### A.     This Court Should Disqualify Ms. Junghans as Trial Counsel.

Ms. Junghans is a potential trial witness on two separate matters – the allegedly false court-ordered accountings and defendant Hollnagel's allegedly false 2006 tax return. As a result, this Court should disqualify Ms. Junghans as counsel at the trial of this matter. To the extent that Ms. Junghans may be a witness at any evidentiary hearings, this Court should also disqualify her from acting as counsel in those matters, as well.

#### 1.     Legal Standards

With certain exceptions, Local Rule 83.53.7(a) prohibits a lawyer from participating in a trial or evidentiary hearing if the lawyer knows or reasonably should know that she may be called as a witness on the client's behalf. N.D. Ill. LR 83.53.7(a). The above-stated rule does not apply: (a) "if the testimony will relate to an uncontested matter"; (b) "if the testimony will relate to a matter of formality and the lawyer reasonably believes that no substantial evidence will be offered in opposition to the testimony"; (c) "if the testimony will relate to the nature and value of legal services

10

rendered in the case . . . ."; and (d) "as to any other matter, if refusal to act as an advocate would work a substantial hardship on the client." *Id.*

Similarly, Local Rule 83.53.7(b) prohibits a lawyer from participating in a trial or evidentiary hearing "if the lawyer knows or reasonably should know that the lawyer may be called as witness other than on behalf of the client" and knows or reasonably should know that the testimony "is or may be prejudicial to the client." N.D. Ill. LR 83.53.7(b). Local Rule 83.53.7 does not prohibit a disqualified lawyer's law firm from participating in the trial or evidentiary hearing. N.D. Ill. LR 83.53.7(c). Moreover, the rule does not prohibit a disqualified lawyer from participating in other phases of the litigation. *Id.*

The perils of allowing an attorney-witness to participate in a trial include: (a) the appearance of impropriety; (b) prejudice to the opposing party; (c) the possibility of a conflict of interest between the lawyer and the client; and (d) confusion as to whether a "statement by an advocate-witness should be taken as proof or as an analysis of the proof." *Id.*, Committee Comment; *United States. Burke*, No. 09 C 2107, 2010 WL 1654966, at *3 (N.D. Ill. Apr. 22, 2010).

A defendant's interest in being represented by the attorney of his choice is strong, and erroneous disqualification of a defendant's chosen counsel is a structural error. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006). Nevertheless, the Supreme Court has recognized that "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Indeed, "the Sixth Amendment right to choose one's own counsel is circumscribed in several important respects." *Id.* Moreover, "[f]ederal courts have an independent interest in ensuring that criminal trials are

conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160.

### 2.    Analysis

Ms. Junghans is a fact witness with respect to two substantive aspects of this matter. First, Ms. Junghans was involved in the preparation and review of the allegedly fraudulent court-ordered accountings that were produced to the SEC and form the basis of concealment allegations in the fraud counts and substantive obstruction of justice allegations in Count Fifteen. Further, Ms. Junghans was involved in the preparation, review and approval of defendant Hollnagel's allegedly false 2006 federal individual income tax return.

With respect to the court-ordered accountings, Ms. Junghans knows or reasonably should know that she may be called as a witness by defendants Hollnagel and BCI or the government.[7] If called by her clients, Local Rule 83.53.7(a) requires disqualification because none of the exceptions to disqualification apply. The only possible exception defendants Hollnagel and BCI could point to is that Ms. Junghans' inability to act as an advocate would work a substantial hardship on them. However, that is not the case. Ms. Junghans' co-lead counsel is Scott R. Lassar, the former United States Attorney for the Northern District of Illinois. Defendants Hollnagel and BCI cannot credibly claim a substantial hardship if they were to proceed to trial with Mr. Lassar as lead counsel.

If Ms. Junghans were to be called as a witness by the government, disqualification would be required under LR 83.53.7(b) because her testimony may be prejudicial to defendants Hollnagel and BCI. The government anticipates that Ms. Junghans would testify that, at no time, did defendants Hollnagel and BCI inform her that various aspects of the court-ordered accountings were

---

[7]Defendant Collier has also represented that he may call Ms. Junghans as a witness with regard to the court-ordered accountings. R. 162 at 9.

false. Indeed, the government anticipates that Ms. Junghans would testify that her clients advised her that the information was true and, based in part, on those representations, Ms. Junghans was comfortable with the court-ordered accountings being produced to the SEC.

As set forth in the Crime-Fraud Motion, the court-ordered accountings were false in numerous respects. Thus, when defendants Hollnagel and BCI informed Ms. Junghans that the information contained therein was true, they were not being truthful. Testimony by a clients' lawyer that tends to demonstrate that her clients duped her can be nothing other than prejudicial.

With respect to defendant Hollnagel's 2006 tax return, defendant Hollnagel has represented to this Court that Ms. Junghans is a potential witness. R. 169 at 7, n.3. To avoid Ms. Junghans having to testify, defendant Hollnagel offers up the remedy of severing Count Twenty-One from the rest of the trial. *Id.* However, the more efficient and proper remedy is to disqualify Ms. Junghans.

Notably, even if this Court were to sever County Twenty-One, which it should not, this Court still should disqualify Ms. Junghans. Whether at a joint trial or a severed trial, Ms. Junghans is a potential government witness, and her testimony may be prejudicial to defendant Hollnagel. Based on Ms. Junghans' interview, the government anticipates that her testimony would reveal that her client represented to her that the MSA and JVLA were meaningless while, at the same time, reaffirming the validity of the MSA in order to benefit defendant BCI in the SEC Proceeding. The testimony is prejudicial not only because it shows that defendant Hollnagel lied to his attorney but also because it shows the chameleon-like nature of defendant Hollnagel. That is, the testimony reveals how defendant Hollnagel changes his story to fit the circumstances at the time.

Moreover, Ms. Junghans' testimony is prejudicial because it bolsters the credibility of CW-1, who defendants Hollnagel and BCI have tried to vilify at every turn. While Ms. Junghans claims that defendants Hollnagel and Collier lost confidence in everything CW-1 did, defendant

13

Hollnagel's actions show that was not the case. Indeed, through at least late 2008, defendant Hollnagel continued to rely on the MSA – albeit for a different purpose than that for which he originally directed CW-1 to draft it.

The facts demonstrate that Ms. Junghans is a potential witness in this case and, if she is called on behalf of the government, her testimony may be prejudicial to her clients. Accordingly, this Court should disqualify her as counsel at the trial of this matter and at any evidentiary hearings at which she may be called as a witness. *See United States v. Brownridge*, No. 06 CR 451, 2008 WL 4874145, at *5-6 (N.D. Ill. July 10, 2008) (disqualifying counsel pursuant to LR 83.53.7 where defense attorney knew or should have known that he may be called as a rebuttal witness on behalf of his client).

B.      **This Court May Want to Inquire into Whether Ms. Junghans has a Conflict of Interest.**

Based on the above-presented facts related to the preparation of defendant Hollnagel's 2006 tax return, this Court may want to inquire into whether Ms. Junghans has a conflict of interest that precludes her and her law firm from any further participation in this matter.

Ms. Junghans' potential conflict arises out of various possibilities. For instance, at trial, Ms. Junghans may testify inconsistently with defendant Hollnagel.[8] That is, the possibility exists that Ms. Junghans would testify that defendants Collier and Hollnagel told her that they disregarded the MSA and JVLA, while defendant Hollnagel would testify that the MSA and JVLA were not disregarded. Further, Ms. Junghans may have a conflict to the extent she is called upon to advise defendant Hollnagel on how to address the varying versions of the facts regarding the MSA and JVLA, should defendant Hollnagel choose to testify. Ms. Junghans' advice may be clouded by her

---

[8]The government recognizes and respects defendant Hollnagel's Fifth Amendment rights.

14

personal involvement in those facts – *i.e.*, that she was party to a conversation with defendant Hollnagel regarding the validity of the MSA and JVLA. Finally, if defendant Hollnagel chooses to testify, Ms. Junghans may have a conflict if defendant Hollnagel wants to state that he never agreed to disregard the MSA and JVLA. In that instance, Ms. Junghans would have personal knowledge that the testimony was false and could not present it to the Court in good faith.

The Sixth Amendment to the United States Constitution guarantees that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This guarantee contemplates both the right to retain counsel of one's own choosing and the right to employ counsel free of conflicting loyalties. *Wheat*, 486 at 159; *Cuyler v. Sullivan*, 446 U.S. 335 (1980) (defendant is entitled to representation by attorney completely loyal to defendant's cause and unfettered by conflicts); *United States v. Schwarz*, 283 F.3d 76, 90 (2d Cir. 2002) (defendant's "Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel") (citations omitted).

Accordingly, while the right to be represented by an attorney of one's choosing is contemplated by the Sixth Amendment, that right bows to the principle that the defendant have an effective advocate for his cause. *Wheat*, 486 U.S. at 159; *accord United States v. Spears*, 965 F.2d 262, 276 (7th Cir. 1992) (district court may reject defendant's waiver of right to conflict-free counsel in interest of ensuring defendant has effective advocate). In other words, the right to effective counsel whose loyalty is undivided is so paramount "that it must in some cases take precedence over all other considerations, including the expressed preference of the defendant[] . . . and [his] attorney." *United States v. Lawriw*, 568 F.2d 98, 105 n.12 (8th Cir. 1977).

Even if a defendant does not object to being represented by counsel with a potential or actual conflict, and executes a waiver of his right to conflict-free representation, such a waiver may be rejected, because it does not foreclose the possibility that an actual conflict could adversely affect counsel's performance in violation of the Sixth Amendment. *Wheat*, 486 U.S. at 161-62; *Doherty v. United States*, 948 F. Supp. 111, 117 (D. Mass. 1996); *accord Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000). In deciding whether or not to accept a waiver of a conflict, a district court is granted "substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Wheat*, 486 U.S. at 163. This is so because it is notoriously difficult to determine whether a potential conflict will become manifest during the course of a case. *Id.* at 162-63.

The federal courts also have an independent duty to ensure that criminal proceedings are conducted in a manner consistent with both the rules of professional responsibility and the Sixth Amendment, not only to ensure the fair administration of justice, but also to preserve their judgments against subsequent attack on appeal.[9] *Wheat*, 486 U.S. at 160-61. Because of these considerations, and because the integrity of the administration of justice remains paramount, as discussed above, a court's duty to assess conflicts issues persists even in situations where a defendant is prepared to waive any conflict. *Id.* at 153.

---

[9]When a defendant is represented by an attorney who labors under an actual conflict of interest, reversible error occurs where "adverse impact" to the defendant can be shown. *Enoch v. Gramley*, 70 F.3d 1490, 1496 (7th Cir. 1995); *United States v. Tatum*, 943 F.2d 370, 375 (4th Cir. 1991) ("Legal representation which is adversely affected by actual conflicts of interest is never considered harmless error."). The defendant need not show prejudice, merely "conduct by the attorney contrary to the defendant's interests caused by the attorney's conflict." *Enoch*, 70 F.3d at 1496.

The loyalty and confidentiality provisions of the Local Rules of this Court, which apply to Ms. Junghans, also limit an attorney's ability to represent a client where the lawyer's own interests materially limit the lawyer's representation of the client. N.D. Ill. LR 83.51.7. Specifically, Local Rule 83.51.7(b) provides that a lawyer shall not represent a client where the representation may be materially limited by the lawyer's own interests unless the lawyer reasonably believes "the representation will not be adversely affected," and the client consents after disclosure. *Id.*

At present, the government does not know the trial strategy of defendants Hollnagel and BCI. Further, the government does not know whether defendant Hollnagel will testify at trial. Due to all of these unknowns, the government cannot say with certainty whether there is a serious potential for a conflict. However, the government can state with certainty that the potential is there. To the extent the potential conflict turns into an actual conflict, it could provide grounds for reversal in the event of a guilty verdict. *See Enoch*, 70 F.3d at 1496. It is not in the interest of this Court or the parties to move forward with what is anticipated to be a lengthy trial knowing that it has a reversible error built into it. In order to avoid such a result, the government respectfully suggests that this Court may want to conduct an inquiry into this potential conflict. To ensure full candor, the government would not object to the Court conducting the inquiry *in camera* and *ex parte*.

## IV. Conclusion

This Court should disqualify Ms. Junghans as counsel at the trial of this matter and at any evidentiary hearings in which she may need to testify as a witness. Ms. Junghans is a potential witness for both her clients and the government. Any testimony Ms. Junghans would provide if called by the government would be prejudicial to her clients. Defendants Hollnagel and BCI would not suffer substantial hardship as a result of the requested disqualification because they also are represented by Scott R. Lassar, a very capable and skilled defense attorney.

This Court may also want to inquire into whether Ms. Junghans and her law firm have a conflict of interest that requires their disqualification from this matter altogether. The government does not oppose the inquiry being conduct *in camera* and *ex parte.*

Dated: March 31, 2011

Respectfully Submitted,

PATRICK J. FITZGERALD
United States Attorney

By:     /s *Scott R. Drury*
SCOTT R. DRURY
KENNETH E. YEADON
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-1416

18